DUFF, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO
ET AL., APPELLEES.
KELLNER, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF
OHIO ET AL., APPELLEES.
CITY OF LIMA, APPELLANT, v. PUBLIC UTILITIES COMMISSION
OF OHIO ET AL., APPELLEES.
CARPENTER ET AL., D. B. A. CARPENTER RADIO COMPANY,
APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL.,
APPELLEES.

(Nos. 77-919, 77-927, 77-943 and 77-954—Decided
December 7, 1978.)

369

*Mr. H. Thompson Duff, pro se.*
*Ms. Edith C. Kellner, pro se.*
*Mr. Allan D. Dobnicker,* director of law, and *Mr. Robert R. Cupp,* for the city of Lima.
*Mr. James M. Carpenter, pro se.*
*Mr. William J. Brown,* attorney general *Mr. Marvin I. Resnik* and *Ms. Judith B. Sanders,* for appellee.
*Messrs. Squire, Sanders & Dempsey, Mr. Alan P. Buchmann* and *Mr. Kevin T. Duffy,* for intervening appellee The United Telephone Company of Ohio.

*Per Curiam.*

## I. (Case No. 77-919.)

The first appeal is presented by H. Thompson Duff. Appellant Duff basically advances three arguments, the first of which is that the commission abused its discretion by not including all elements of depreciation in its valuation of UTC's property.[2] Specifically, he alleges that obsolescence was ignored as a depreciating factor, which, according to R. C. 4909.05(E), must be included in the depreciation calculation. The problem arises because the different classes of depreciation were not detailed by the commission in its staff report. There is testimony in the record, however, that the method employed by the commission to compute depreciation did in fact reflect all causes of depreciation, including obsolescence. Where, as here, there is evidence to support a finding of the commission, this court will not disturb the finding absent a showing of "misapprehension or mistake or willful disregard of duty." *Cleveland* v. *Pub. Util. Comm.* (1965), 3 Ohio St. 2d 82, 84. As appellant has failed to make such showing, his argument is not well taken.

Appellant Duff alleges next that the commission erred by failing to separately state the percentage and amount of each of the various classes of depreciation, in accordance with R. C. 4909.05(E).

R. C. 4909.05 provides, in relevant part: "In ascertaining such value [the value of the applicant's property], the commission may ascertain and report *in such detail as it deems necessary * * * the following facts.*" (Emphasis added.) "Following facts" refers to elements set forth in subsequent subsections, including the subsection in question, R. C. 4909.05(E). This is a clear grant of discretion to the commission to report in such detail as the commission determines is proper, and this court has so held in *Ohio*

---

[2] We interpret appellants' contentions in these cases that the commission "abused its discretion" to mean that the final order issued by the commission was "unlawful or unreasonable," the only ground by which this court may reverse an order of the commission. R. C. 4903.13.

*Edison Co.* v. *Pub. Util. Comm.* (1962), 173 Ohio St. 478, at page 481, as follows:

" * * * the commission is not required by that statute [R. C. 4909.05(E)] to state separately the 'percentage and amount of each class of depreciation' as long as it properly determines an amount for 'depreciation from the new reproductive cost, as of' the 'date certain.' "

Appellant Duff focuses on the word "properly" in the above language and contends that the depreciation was not "properly" determined so as to justify the commission's method of reporting its findings. To support this contention, appellant relies on the testimony of UTC's depreciation witness, arguing that reliance on this witness' method of depreciation leads to an improper final determination. Whether such contention is true is irrelevant, however, because the commission followed the methodology of the commission staff, not UTC's witness. Appellant Duff's second argument is without merit.

Finally, appellant Duff proposes that the rate increases adopted by the commission in this cause are discriminatory in that they are higher than those charged in other areas of the state. Specifically, appellant compared the rates charged by UTC with those charged by Ohio Bell.

Under the rate setting procedures established in *Cleveland* v. *Pub. Util. Comm.* (1956), 164 Ohio St. 442, comparing the rates charged by one utility with another is not a proper standard to determine their reasonableness. In addition, there is no statutory basis for such a procedure. Accordingly, the order of the commission as to appellant Duff is affirmed.

## II. (Case No. 77-927.)

Appellant Edith C. Kellner's allegations of error are directed to the conduct of the commission's hearings. Appellant cites specifically as error the refusal of attorney-examiner Barth E. Royer to disqualify himself from the February 14 hearing. The charge is based on an alleged conflict of interest arising from the prior association of Philip S. Schaefer, counsel for UTC at the November 10,

1976, hearing, with the attorney-examiner, as co-hearing officers in a previous rate case involving UTC. Appellant relies upon EC 9-3 of the Code of Professional Responsibility and Canon 3C of the Code of Judicial Conduct as authority for her position.

EC 9-3 of the Code of Professional Responsibility reads as follows:

"After a lawyer leaves judicial office or other public employment, he should not accept employment in connection with any matter in which he had substantial responsibility prior to his leaving, since to accept employment would give the appearance of impropriety even if none exists."

This does not describe the situation of attorney-examiner Royer, who is not the attorney that left the employ of the commission. Whether attorney Schaefer should have made an appearance in this cause for UTC has not been placed in issue before this court.

Canon 3C of the Code of Judicial Conduct states, in pertinent part:

"(1) A judge should disqualify himself in a proceeding in which his *impartiality might reasonably be questioned* including but not limited to instances where:

"* * *

"(b) he served as a lawyer *in the matter in controversy*, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter * * *." (Emphasis added.)

The commentary to Canon 3C(1)(b) provides that:

"*A lawyer in a governmental agency does not necessarily have an association with other lawyers employed by that agency within the meaning of this subsection* * * *."

The mere fact that attorney Schaefer and attorney-examiner Royer worked together on a previous UTC rate case does not necessarily establish an "association" between the two. Furthermore, even if working together on a prior rate case would constitute an "association" between the two men, Canon 3C(1)(b) specifically requires that the "association" refer to "the matter in controversy." The two rate

case applications here were clearly separate and distinct matters. While the subsections to Canon 3(C)(1) are not an exclusive list of instances calling for judicial disqualification, they nonetheless provide the parameters for cases presenting similar factual matters. It is this court's determination that appellant has failed to establish that attorney-examiner Royer's "impartiality might reasonably be questioned."

Appellant proposes next that attorney-examiner Royer displayed an unfair attitude toward her. This contention is not supported by the record. The hearing examiner did become somewhat impatient with a number of *pro se* intervenors, such as appellant, but only as a result of the intervenors' lack of comprehension of the legal proceedings in which they were involved. The examiner went to extraordinary measures to allow the appellant to participate in the hearings as much as possible.

Appellant also argues that she was denied due process as a result of attorney-examiner Royer refusing to allow her to question certain witnesses concerning service of the staff report. The examiner refused to allow this line of questioning as being clearly irrelevant. The commission had acklowledged the oversight in its December 15, 1976, opinion and order. During the February 14, 1977, hearing testimony was given that the staff report had been properly mailed before December 15, 1976. Further questioning would have served no purpose other than to burden an already lengthy record. Appellant has failed to show a mistake of law or the consequent prejudicial error required to overturn an order of the commission. *Worthington Hills Civic Assn. v. Pub. Util. Comm.* (1976), 45 Ohio St. 2d 11. The order of the commission as to appellant Kellner is affirmed.

### III. (Case No. 77-943.)

Appellant city of Lima contends first that the commission's refusal to continue its public hearings five months until July 1, 1977, in order to give appellant time to further prepare constitutes an abuse of the commission's discretion.

R. C. 4909.19 reads, in pertinent part:

"The commission may grant continuances for a longer period than three days upon its order for good cause shown."

Thus the commission is not required to grant a continuance of five months as suggested by appellant, but rather it has the authority to do so only upon a showing of good cause by the requesting party. Appellant contends that it has shown good cause in that it was given insufficient time to make an independent investigation of UTC's records. The commission contends that appellant did have sufficient time in that all statutory requirements concerning notification of parties under R. C. 4909.19 were complied with by the commission.

In *Akron* v. *Pub. Util. Comm.* (1966), 5 Ohio St. 2d 237, 241, this court held: "Orders granting or refusing continuance * * * generally rest * * * in the sound discretion of the commission." As compliance with statutory procedures here gave appellant adequate notice of forthcoming proceedings, this court finds that the commission did not abuse its discretion by concluding appellant failed to show the "good cause" necessary to support a motion for continuance.

Appellant proposes next that the commission's order of May 4, 1977, must be reversed because expert testimony prefiled in written form was not sworn to by the expert witnesses at the time of filing.

Under Ohio Adm. Code Section 4901-1-30(A), expert testimony in a rate case must be reduced to writing and filed with the commission and opposing counsel ten days prior to a hearing. Appellant contends that prefiled testimony which is unsworn at the time it is filed violates R. C. 2317.30, which states: "Before testifying, a witness shall be sworn to testify the truth, the whole truth and nothing but the truth."

This argument is rendered specious by the fact that the expert witnesses were sworn in before testifying at the hearing and then, under oath, adopted their prefiled written testimony. It was at this point that the written testi-

mony became evidence, not at the time of filing. Furthermore, the city of Lima failed to show how it has been prejudiced by the unsworn nature of the prefiled testimony. It is clear that an order of the commission will not be reversed unless there is evidence of an error which is prejudicial in nature. *Worthington Hills, supra* (45 Ohio St. 2d 11).

The city of Lima's third argument challenges the validity of the commission's emergency order issued December 15, 1976. There are essentially three aspects to this challenge. Specifically, appellant contends that: (1) the commission's failure to mail the staff reports in accordance with R. C. 4909.19 deprived the commission of jurisdiction to issue an emergency order; (2) before an emergency order may issue, the commission must hold a hearing upon application to determine whether an emergency in fact exists; and (3) regardless of the court's determination of these first two issues, the commission nevertheless abused its discretion by issuing an emergency order without sufficient evidentiary basis to support such order. Appellant seeks a refund of all monies collected pursuant to the emergency rate increase, up to the time of issuance of the commission's final order.

The failure of the commission to send staff reports to the mayors of cities affected by UTC's service is not disputed. What is disputed are the consequences of this oversight. Appellant urges that an order issued when this statutory provision has not been complied with is a nullity.[3] Appellant, in effect, attaches jurisdictional significance to this portion of the statute. This court disagrees. The General Assembly did not require that the staff reports be sent to

[3]The emergency powers provision found in R. C. 4909.16 does not require service of a staff report as a precondition to the commission's power to issue an emergency order. Appellant's contention is that the November 23, 1976 order was a nullity for failure to serve the staff reports; that the emergency order adopted, and therefore was derivative from, the November 23, 1976, order; and that the emergency order was therefore also a nullity. While this court does not judge the merits of such reasoning here, it is acceptable for the purpose of appellant's argument.

the mayors as a means of giving notice of application, pursuant to which jurisdiction is acquired; rather, this provision was intended to facilitate meaningful contest of rate increase applications by providing interested parties with the materials necessary for an informed challenge. It is akin to a mandatory discovery provision, independent of jurisdictional requirements. Indeed, it is another provision in R. C. 4909.19 which requires the public utility to "publish the substance and prayer of such application, in a form approved by the public utilities commission, once a week for three consecutive weeks in a newspaper published and in general circulation throughout the territory in which such public utility operates and affected by the matters referred to in said application * * *." Compliance with this provision gives potentially interested parties the constructive notice of application necessary to confer the commission with jurisdiction. We therefore find it unnecessary and inconsistent with the apparent legislative intent to treat the sending of staff reports as a precondition to obtaining jurisdiction over the parties.[4]

This court, having established that this provision is non-jurisdictional, must consider the question as to what remedy is proper when the commission fails to comply with the statute. In this cause the commission ordered proper service of the report and scheduled a new hearing. In the same entry the commission ordered the rates previously approved to remain in effect, subject to refund, pending the decision at the new hearing. This court finds nothing improper here. Appellant's opportunity to pursuade the commission that the rate increase was improper at the February 14 hearings was adequate. If appellant had been

[4] Clearly this is not required in cases where the "interested parties" entitled by R. C. 4909.19 to challenge applications for rate increases are not mayors of municipal corporations affected by the application. In these cases discretion lies in the commission to mail copies of the staff report "to such other persons as the commission deems interested." Yet, there is no contention that those parties who do not receive a staff report are any less bound by an order of the commission than those mayors who do. Staff reports have no effect on jurisdiction here.

successful, the money would have been refunded in accordance with the emergency order. Since an order of the commission will not be reversed unless prejudice is shown, and appellant has failed to show any prejudice, the order of December 15, 1976, will not be reversed on the basis of appellant's first argument. *Electrical Protection Assn.* v. *Pub. Util. Comm.* (1977), 50 Ohio St. 2d 169.

Appellant also attacks the emergency order on the ground that no application was filed by UTC for the order, nor was a hearing held to determine if in fact an emergency existed. Neither contention finds statutory support in the emergency powers provision of R. C. 4909.16, which reads, in relevant part:

"*When the public utilities commission deems it necessary* to prevent injury to the business or interests of the public or of any public utility of this state in case of any emergency *to be judged by the commission,* it may temporarily alter, amend, or, with the consent of the public utility concerned, suspend any existing rates, schedules, or order relating to or affecting any public utility or part of any public utility in this state." (Emphasis added.)

The commission explained that it took it upon itself to issue the emergency order, without application by UTC, in order to rectify its previous oversight as to the staff reports. Considering the discretion given to the commission to exercise its emergency powers when it "deems necessary," it is not improper for the commission to consider emergency measures upon its own motion.

As to the question of whether a prior hearing is required in order to determine if an emergency exists, cases challenging this emergency power in the past reveal that the commission does normally conduct such a hearing before issuing an emergency order. While this may often be desirable, this court finds no authority which compels a prior hearing. Indeed, there are situations where a separate hearing would lead to substantial delay, causing the exact injury which R. C. 4909.16 seeks to avoid. This court will not engraft language on the statute which finds no other support within the statute or in the case law, where

such modification would be contrary to the declared legislative purpose "to empower the commission to take immediate action to protect the public or a utility." *Cincinnati* v. *Pub. Util. Comm.* (1948), 149 Ohio St. 570, 575.

The city of Lima's final challenge to the emergency order alleges that the commission abused its discretion by issuing the order when there was no evidence to support a finding that an emergency existed. Under the statute, the determination of an emergency rests within the sound discretion of the commission. *Cambridge* v. *Pub. Util. Comm.* (1953), 159 Ohio St. 88. The commission states that by its oversight in sending out the staff reports it believed an emergency situation had been created, with potential damaging effect to UTC if the increase was not granted immediately. Again, this court will not substitute its judgment for that of the commission's when the commission's findings are reasonably supported. *Cleveland* v. *Pub. Util. Comm., supra* (3 Ohio St. 2d 82). Accordingly, the commission's emergency order of December 15, 1976, will not be disturbed.

Appellant city of Lima's fourth proposition charges a conflict of interest between attorney-examiner Royer and counsel for UTC, Schaefer. The issue was discussed and resolved in appellant Kellner's appeal in part II, *supra.*

In its fifth proposition of law appellant alleges that R. C. 4909.05 required the commission to specifically enumerate each class of depreciation before computing the rate base. As this too has previously been disposed of, no further discussion is merited.

In its sixth and final proposition of law, appellant contends that the commission violated R. C. 4909.05(B) when it failed to value UTC's land by comparing it to neighboring parcels. The commission admits that its staff did not personally compare each parcel of land to contiguous parcels to arrive at its value but explains that it used the county auditor's appraisal figures which were updated to arrive at fair market value. This method satisfies R. C. 4909.05 which only requires that the commission follow the enumerated methods in computing value to the extent

that "it [the commission] deems necessary." Appellant's argument is therefore rejected and the commission's order as to the city of Lima is affirmed.

IV. (Case No. 77-954.)

The final appeal is brought by appellants Carpenter. Appellants assert that the emergency order of the commission should be vacated as a result of defects in the stipulation agreement of November 10, 1976. These defects involve a handwritten correction of a typographical error left uninitialed by all parties and a misnumbering of the last page of the stipulation.

A stipulation entered into by the parties present at a commission hearing is merely a recommendation made to the commission and is in no sense legally binding upon the commission. The commission may take the stipulation into consideration, but must determine what is just and reasonable from the evidence presented at the hearing. Appellants have failed to show by this argument that the commission's order was manifestly against the weight of evidence so as to justify reversal. *Cleveland Elec. Illuminating Co. v. Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403.

Appellants also attack the validity of a stipulation apparently entered in a previous rate case involving UTC. This allegation has no bearing on the case at bar and any possible objection has long since been waived.

Appellants argue further that the hearing examiner erred in not ruling upon their motion to vacate the commission's emergency order until the close of the hearings. Under R. C. 4901.13 the commission has broad discretion in the conduct of its hearings. Appellants have not shown that the examiner's action constituted grounds for reversal. *Cleveland Elec. Illuminating Co. v. Pub. Util. Comm.*, *supra.*

In their third proposition of law, appellants adopt the argument of appellant city of Lima in regard to the commission's authority to issue an emergency order without holding an evidentiary hearing. This issue was discussed at length and resolved in part III, *supra.*

Finally, appellants argue that the commission erred in

adopting the "examiner's report" without full deliberation on its merits. A review of appellants' record fails to reveal an "examiner's report" which was used by the commission. R. C. 4909.19 specifically authorizes the commission to procure an investigative report on rate applications. If this is the report to which appellants refer, then their proposition is without merit since the commission is at liberty to adopt or reject the findings of its own staff report. The order of the commission as to appellants Carpenter must, therefore, be affirmed.

Accordingly, the order of the commission as to all appellants, being reasonable and lawful, is hereby affirmed.

*Order affirmed.*

LEACH, C. J., HERBERT, W. BROWN, P. BROWN and SWEENEY, JJ., concur.

CELEBREZZE and LOCHER, JJ., concur in case No. 77-927 but dissent in cases Nos. 77-919, 77-943 and 77-954.

LOCHER, J., dissenting in cases Nos. 77-919, 77-943 and 77-954. The commission's entry of December 15, 1976, declaring an emergency and temporarily approving the rates of its November 23, 1976, entry is an aberrant and highly pernicious procedure. The issue whether the commission must hold a hearing prior to determining whether an emergency exists is not as simplistic as the majority's discussion suggests. In most of the previous cases a hearing was held. *Akron* v. *Pub. Util. Comm.* (1933), 126 Ohio St. 333; *Ohio Manufacturers' Assn.* v. *Pub. Util. Comm.* (1976), 45 Ohio St. 2d 86; *Coalition of Concerned Utility Users* v. *Pub. Util. Comm.* (1976), 45 Ohio St. 2d 151. Furthermore, in *Akron* v. *Pub. Util. Comm., supra,* this court stated, at page 336:

"* * * It will be conceded that the Public Utilities Commission ordinarily has the power, *on proper hearing,* to increase or reduce a rate in case of emergency * * *." (Emphasis added.)

The prior interpretation of R. C. 4909.16 is clearly contrary to the present finding of the majority. The wording of R. C. 4909.16 is also supportive of this prior interpretation. R. C. 4909.16 reads, in pertinent part:

"When the public utilities commission deems it necessary to *prevent injury to the business or interests of the public or any public utility* of this state in case of any emergency to *be judged* by the commission * * *." (Emphasis added.)

This section implies the finding of injury to the public or public utility. Moreover, the statute states "any emergency to *be judged*," not "declared." Upon what can an emergency *be judged* if there was no hearing to present evidence? It is apparent in the instant cause that the commission simply declared an emergency.

A perusal of the facts in the instant cause is revealing. The November 23 entry was the adoption of a stipulation entered into by the parties *present at the hearing* which authorized 94 percent of the increase originally requested by UTC. This stipulation was not joined in by the city of Lima. Indeed, the commission had erroneously failed to serve the staff report upon the mayors of all the municipalities in UTC's service area, as required by R. C. 4909.19. In its December 15 entry, the commission acknowledged its error, ordered service of the report on mayors not previously served, set the new hearing for February 1, 1977, and then allegedly exercised its emergency powers to temporarily approve the rates set in its November 23 entry. The commission thus knowingly placed into effect a rate based upon a stipulation to which the city of Lima was not a party. The emergency was not based upon evidence, but mere supposition that a delay in granting the rate increase would be detrimental. This was an attempt by the commission to correct its mistake by declaring an emergency. I seriously doubt that the General Assembly intended R. C. 4909.16 to be used by the commission to whitewash its own errors. There is no evidence of any injury to the public or to the utility upon which an emergency could

be judged to exist. Accordingly, I view the emergency order temporarily approving the rate increase as void *ab initio.*

This consolidated cause raises the additional issue of whether the commission erred in failing to separately state the percentage and amount of each of the various classes of depreciation in accordance with R. C. 4909.05(E). I acknowledge that this court, in *Ohio Edison Co.* v. *Pub. Util. Comm.* (1962), 173 Ohio St. 478, found that the commission has discretion and is not required to state separately the percentage and amount of each class of depreciation as long as it properly determines an amount for depreciation from the new reproduction costs as of a date certain. Appellant Duff forcefully argues that obsolescence of UTC's plant and equipment, which would affect its rate base, cannot be determined when a specific breakdown is not furnished. Appellant contends that UTC has continued to purchase equipment of an old design and that modern technology has made this equipment obsolete. Thus, if depreciation included all the technological obsolescence, the rate base would have been smaller and the actual rate of return would be higher than that approved by the commission. It not being possible to determine the extent technical obsolescence was considered, absent a specific breakdown, the commission could not properly determine an amount for depreciation. This court's statement, in *Ohio Edison Co.* v. *Pub. Util. Comm., supra,* thus requires the commission to state separately the percentage and amount of each class of depreciation.

For the preceding reasons, I respectfully dissent.

CELEBREZZE, J., concurs in the foregoing dissenting opinion.