[Cite as *In re Application of Columbus S. Power Co.*, 129 Ohio St.3d 46, 2011-Ohio-2383.]

IN RE APPLICATION OF COLUMBUS SOUTHERN POWER COMPANY FOR

APPROVAL OF ITS PROGRAM PORTFOLIO PLAN;

INDUSTRIAL ENERGY USERS-OHIO, APPELLANT; PUBLIC UTILITIES

COMMISSION ET AL., APPELLEES.

[Cite as *In re Application of Columbus S. Power Co.*,

**129 Ohio St.3d 46, 2011-Ohio-2383.**]

*Public utilities — R.C. 4928.66 — Public Utilities Commission's order approving*

*electric-distribution utility's program portfolio plan upheld.*

(No. 2010-1533 — Submitted April 6, 2011 — Decided May 24, 2011.)

APPEAL from the Public Utilities Commission, No. 09-1089-EL-POR.

_____

**LUNDBERG STRATTON, J.**

{¶ 1}  In the case below, the Public Utilities Commission approved a "program portfolio plan" proposed by the American Electric Power ("AEP") operating companies. The plan, developed in consultation with a wide array of interested parties, contains a variety of programs that are designed to increase energy efficiency and reduce peak demands on AEP's system. Such programs are required by law. R.C. 4928.66(A)(1).

{¶ 2}  Industrial Energy Users-Ohio ("IEU") appeals from the commission's approval of the plan on four grounds. None of its arguments compels reversal, and we affirm.

**Background**

{¶ 3}  Under R.C. 4928.66, electric-distribution utilities must implement programs to increase energy efficiency and to reduce peak demand. R.C. 4928.66(A)(1)(a) and (b). Energy-efficiency measures reduce the amount of energy required to perform tasks. Ohio Adm.Code 4901:1-39-01(L). "Peak

demand" refers to the measure of electricity usage at the time when the most energy is being consumed simultaneously. Ohio Adm.Code 4901:1-39-01(R). Reducing peak demand, other things being equal, lowers the price of power and forestalls the need to add new generation plants. See, e.g., *Natural Resources Defense Council, Inc. v. Herrington* (C.A.D.C.1985), 768 F.2d 1355, 1414 (discussing benefits of peak-demand reductions). The statute imposes annual goals in both categories, R.C. 4928.66(A)(1)(a) and (b), and if an electric-distribution utility does not meet the goals, the law authorizes forfeitures, R.C. 4928.66(C).

{¶ 4} The statute also allows the commission to approve "a revenue-decoupling mechanism." R.C. 4928.66(D). Such mechanisms separate (or "decouple") the recovery of fixed distribution costs from the volume of sales. Before it can approve a proposed revenue-decoupling mechanism, the commission must determine two things: first, that the mechanism "provides for the recovery of revenue that otherwise may be foregone by the utility as a result of or in connection with the implementation by the electric distribution utility of any energy efficiency or energy conservation programs," and second, that the mechanism "reasonably aligns the interests of the utility and of its customers in favor of those programs." Id.

{¶ 5} On November 12, 2009, the AEP operating companies, Columbus Southern Power ("CSP") and Ohio Power Company, filed an application seeking approval of a "Three-Year Program Portfolio Plan," which presented a three-year approach to meeting the companies' energy-efficiency and peak-demand-reduction goals. The plan had been developed in consultation with a group of interested parties, and along with the plan, the companies filed a stipulation to help resolve various issues. Among other things, the stipulation provided AEP with a revenue-decoupling mechanism, which the parties expected to run for three years.

{¶ 6} IEU opposed the stipulation. It intervened, lodged objections to the portfolio plan, and sponsored testimony in support of its objections.

{¶ 7} The commission held a hearing on the stipulation on February 25, 2010, and on May 13, it issued an order modifying and approving the stipulation. One of the modifications pertained to the proposed decoupling mechanism. Instead of allowing the mechanism to run for three years (and thus end sometime in 2013), the commission prescribed an end date of January 1, 2011. This limitation on the period in which AEP could recover forgone revenue reflected the commission's concern whether the companies' distribution rates—which had last been reviewed in 1991 (CSP) and 1994 (Ohio Power Company)—accurately reflected their costs. The commission "encouraged" the companies "to propose a mechanism to answer the Commission's concern regarding quantification of fixed costs."

{¶ 8} IEU filed an application for rehearing, which the commission denied on July 14. This appeal followed. Apparently due to a filing error before the commission, IEU appealed the order only as it pertained to CSP and not to its sister company, Ohio Power Company. CSP has intervened as an appellee.

## Discussion

{¶ 9} IEU raises four propositions of law. All lack merit, and accordingly we affirm.

*A. IEU has not shown that the commission erred in modifying and approving the revenue-decoupling mechanism*

{¶ 10} In its first proposition of law, IEU challenges the commission's approval of CSP's requested decoupling mechanism. The commission actually agreed with IEU's contention that "the record fails to establish what revenue is necessary to provide AEP-Ohio with the opportunity to recover its costs and to earn a fair and reasonable return." But rather than disapprove the decoupling

mechanism altogether, the commission shortened its lifespan from three years to about seven months.

{¶ 11} We agree with IEU that the commission's reasoning had a serious flaw—which we address below—but at the same time, we do not see that the flaw warrants reversal.

1. The outcome of the order was reasonable and lawful

{¶ 12} IEU's argument assumes that CSP was required to prove " 'what revenue is necessary to provide [it] with the opportunity to recover its costs and to earn a fair and reasonable return.' "  According to IEU, this cost-of-service evidence is required by R.C. 4928.66(D) and Ohio Adm.Code 4901:1-39-07(A). We disagree.

{¶ 13} We can quickly dispense with the administrative-rule argument made by IEU.  Ohio Adm.Code 4901:1-39-07(A) contains no requirement that utilities demonstrate their cost of service.  It simply allows "appropriate lost distribution revenues."

{¶ 14} As for the statute, R.C. 4928.66(D) contains two requirements that an application for a revenue-decoupling mechanism must meet before the commission may approve it, but IEU does not explain which one it alleges was not met, and we fail to see any statutory violation.

{¶ 15} The first requirement is that the decoupling mechanism provide only for "the recovery of revenue that otherwise may be foregone by the utility as a result of or in connection with the implementation by the electric distribution utility of any energy efficiency or energy conservation programs."  This clause does not require the commission to find that the recovery of the lost revenue is necessary to recover costs and to ensure a fair rate of return.  In fact, the word "revenue" means the opposite: it means "[g]ross income or receipts."  (Emphasis added.)  Black's Law Dictionary (8th Ed.2004) 1344.  If CSP loses sales, it loses

4

gross income, regardless of its costs, so the first part of subsection (D) does not prohibit recovery.[1]

{¶ 16} The second part of R.C. 4928.66(D) requires the commission to find that the decoupling mechanism "reasonably aligns the interests of the utility and of its customers in favor of [energy-efficiency and energy-conservation] programs." This part of the statute also does not require what IEU says was needed: evidence of the utility's cost of service.

{¶ 17} Thus, none of the authorities cited by IEU require evidence of the utility's cost of service. Nevertheless, the commission plainly took the lack of cost evidence into account. Sharing IEU's concern that CSP's distribution rates might be too high, the commission sharply limited the period in which CSP could recoup lost revenue. If anyone was harmed by that decision, it was CSP, but CSP did not appeal. We therefore need not decide whether R.C. 4928.66 entitled the commission to do what it did: reduce the recovery of lost revenue based on concerns regarding the utility's cost of service. But the statute plainly does not do what IEU wants it to: absolutely prohibit recovery if the utility's cost of service is unknown. For these reasons, we affirm this part of the order.

2. Although the commission erred in its reasoning, that error
does not warrant remand

{¶ 18} Although we affirm the commission's order regarding decoupling, we are troubled by some of the reasoning in the commission's order. The commission appeared to believe that the requirement that its findings be based on record evidence is somehow lessened when the commission is reviewing a stipulation. For example, the commission stated in its entry on rehearing that "in

---

1. The statute permits recovery of revenue that otherwise might be forgone "as a result of or in connection with" certain programs. R.C. 4928.66(D). IEU does not argue that this causal requirement was unmet, and we do not consider the matter.

a litigated case," it "would have required more information to find that AEP-Ohio had met its burden of proof."

{¶ 19} Contrary to the commission's statement, this *was* "a litigated case"—IEU contested the stipulation. When the commission reviews a contested stipulation, the requirement of evidentiary support remains operative. While the commission "may place substantial weight on the terms of a stipulation," it "must determine, *from the evidence*, what is just and reasonable." (Emphasis added.) *Consumers' Counsel v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 123, 126, 592 N.E.2d 1370. Numerous cases, including several in the last ten years, confirm the point. See, e.g., *Duff v. Pub. Util. Comm.* (1978), 56 Ohio St.2d 367, 379, 10 O.O.3d 493, 384 N.E.2d 264 ("The commission may take the stipulation into consideration, but must determine what is just and reasonable from the evidence presented at the hearing"); *Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, 871 N.E.2d 1176, ¶ 38; *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 49; *AK Steel Corp. v. Pub. Util. Comm.* (2002), 95 Ohio St.3d 81, 83, 765 N.E.2d 862. Indeed, the very case cited by the commission concerning the approval of stipulations made precisely this point: "stipulations are considered merely as recommendations to the commission and, while entitled to substantial weight, they must be supported by the evidence of record to withstand [appellate] scrutiny." *Indus. Energy Consumers of Ohio Power Co. v. Pub. Util. Comm.* (1994), 68 Ohio St.3d 559, 563, 629 N.E.2d 423. The agreement of *some* parties is no substitute for the many procedural protections reinforced by the evidentiary-support requirement.

{¶ 20} Here, however, no one challenges the legality of the commission's specific decision to cut short CSP's decoupling mechanism. And IEU has not shown that the law required the commission to go any further. While the

commission may have erred in its reasoning, that error is harmless. For that reason, we reject IEU's first proposition of law.

B. *Contrary to IEU's assertions, the commission considered price impact*

{¶ 21} In its second proposition of law, IEU argues that the commission failed to "consider[] the overall rate impacts on Ohio customers." This claim is meritless.

{¶ 22} The commission expressly considered the impact of rate increases. The order contained a section entitled "Consideration of Rate Increases." In that section, the commission discussed IEU's argument that "approval of the Stipulation will result in a rate increase for customers" and that the commission should not view the increase in isolation "but must consider other recent rate increases approved by the Commission." The entry on rehearing stated, "The Commission is mindful of the rate impact of this case on AEP-Ohio's customers."

{¶ 23} The commission considered the overall effects of rates, and we reject IEU's second proposition of law.

C. *IEU has not shown that CSP's plan for reducing peak demand was unlawful*

{¶ 24} In its third proposition of law, IEU raises two challenges to CSP's plan for reducing peak demand. One challenge was forfeited, and the other is flawed.

{¶ 25} IEU's first argument is that CSP's peak-reduction program is "not designed to achieve" the statutory mandates of R.C. 4928.66. This argument was not raised before the commission on rehearing, so we lack jurisdiction to consider it. See, e.g., *Ohio Partners for Affordable Energy v. Pub. Util. Comm.*, 115 Ohio St.3d 208, 2007-Ohio-4790, 874 N.E.2d 764, ¶ 15.

{¶ 26} IEU did raise its second argument below, but it lacks merit. The commission did not adopt IEU's preferred way of reducing peak demand—details on that method need not be discussed to dispose of IEU's argument. Pertinent here, IEU asserts that its preferred method "could lower the overall cost of AEP-

Ohio's Portfolio Plan by approximately $7 million." IEU then argues, "Ignoring known lower cost options that reduce the overall cost of AEP-Ohio's Portfolio Plan does not benefit ratepayers and is not in the public interest."

**{¶ 27}** IEU is attacking a discretionary decision, so our standard of review is deferential. The statute creates a goal (peak-demand reduction), but does not tell the commission how to get there. See R.C. 4928.66(A)(1)(b). This gives the commission discretion to find its way. See, e.g., *Payphone Assn. v. Pub. Util. Comm.*, 109 Ohio St.3d 453, 2006-Ohio-2988, 849 N.E.2d 4, ¶ 25 ("When a statute does not prescribe a particular formula, the PUCO is vested with broad discretion").

**{¶ 28}** IEU has not shown an abuse of discretion. We will assume for the sake of argument that IEU's preferred method is in fact less expensive than the one proposed by CSP. Even so, the mere fact that one program is less expensive than another is not grounds for selecting it. The applicable statute does not require use of the "least cost" method. See R.C. 4928.66(A)(1)(b); cf. R.C. 4928.142(C) (requiring selection of the "least-cost bid"). And as a matter of common sense, one must evaluate costs *and* benefits, but IEU adduces no evidence showing the relative benefits of the competing plans. CSP's peak-demand-reduction plan covers multiple years and numerous industries and rate classes to address a highly complex problem, and there are many concerns (beyond simple cost) that CSP and the commission must account for in structuring these plans.

**{¶ 29}** While cost is surely a relevant concern to be balanced in evaluating peak-demand-reduction plans, it is not the only concern, and the commission is entitled to consider more. IEU's third proposition of law is rejected.

*D. IEU has not shown that the commission erred when it rejected a cost-saving program designed for mercantile customers*

**{¶ 30}** In its fourth proposition of law, IEU argues that the commission erred by "prohibiting * * * mercantile customers from relying on the 'benchmark comparison method' for agreements reached after December 10, 2009." R.C. 4928.66(A)(2)(c) permits the commission to "exempt mercantile customers" from paying energy-efficiency and peak-demand-reduction charges if those customers "commit their demand-response or other customer-sited capabilities" toward the utility's energy-reduction goals.

**{¶ 31}** The stipulation proposed two methods allowing mercantile customers to seek this rate exemption. The commission rejected one of them (the "benchmark-comparison method") because it had already decided against using this method in the related rulemaking case. This method had been favored by IEU.

**{¶ 32}** On appeal, IEU lists several aspects of this decision that it disagrees with, but none of its complaints demonstrates reversible error.

**{¶ 33}** IEU emphasizes that "[t]he PUCO unilaterally modified the only universally supported provision" of the stipulation. But the commission "is not bound to accept the terms of any stipulation," *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 114 Ohio St.3d 340, 2007-Ohio-4276, 872 N.E.2d 269, ¶ 16, so this does not provide grounds to reverse.

**{¶ 34}** IEU also states that the commission's rules do not address "what criteria must be met in order for a mercantile customer to qualify for an exemption from the rider." But the commission addressed this issue in its entry on rehearing. It explained that it was in the process of developing an application and filing instructions to enable mercantile customers to request the exemption. IEU gives us no reason to think that the commission needed to develop these specific standards *before* it approved the wide-ranging portfolio plan—of which mercantile-exemption applications are but a part. At its heart, then, IEU's attack is against a docket-management decision. We generally defer to the commission

on such decisions, *Toledo Coalition for Safe Energy v. Pub. Util. Comm.* (1982), 69 Ohio St.2d 559, 560, 23 O.O.3d 474, 433 N.E.2d 212, and do so here.

**{¶ 35}** Finally, IEU states, "The [commission] failed to articulate why the benchmark compliance methodology * * * is not an appropriate methodology or does not meet the settlement review criteria." That is not true—the commission did articulate why IEU's preferred method was not an appropriate method. As already noted, the commission had rejected use of that method in a separate rulemaking case. This was a reasonable basis on which to act: "an administrative agency cannot ignore its own rules." *State ex rel. Kroger Co. v. Morehouse* (1995), 74 Ohio St.3d 129, 133, 656 N.E.2d 936. Like its other arguments, IEU's last complaint does not support reversal. We reject its fourth proposition of law.

### Conclusion

**{¶ 36}** For the foregoing reasons, we affirm.

Order affirmed.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, CUPP, and McGEE BROWN, JJ., concur.

_____

McNees, Wallace & Nurick, L.L.C., Samuel C. Randazzo, and Joseph E. Oliker, for appellant.

Michael DeWine, Attorney General, William L. Wright, Section Chief, and Thomas W. McNamee and Steven L. Beeler, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

Matthew J. Satterwhite, Steven T. Nourse, and Anne M. Vogel, for intervening appellee Columbus Southern Power Company.

_____