**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Ohio Edison Co.,* Slip Opinion No. 2019-Ohio-4196.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-4196

IN RE APPLICATION OF OHIO EDISON COMPANY, CLEVELAND ELECTRIC ILLUMINATING COMPANY, AND TOLEDO EDISON COMPANY FOR APPROVAL OF THEIR ENERGY EFFICIENCY AND PEAK DEMAND REDUCTION PROGRAM PORTFOLIO PLANS FOR 2017 THROUGH 2019;

OHIO EDISON COMPANY ET AL., APPELLANTS; PUBLIC UTILITIES COMMISSION, APPELLEE; OFFICE OF OHIO CONSUMERS' COUNSEL, INTERVENING APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Ohio Edison Co.,* Slip Opinion No. 2019-Ohio-4196.]**

*Public Utilities—R.C. 4928.66—Energy-efficiency and peak-demand-reduction program portfolio plans—Commission's determination that it was authorized to impose a cap on utilities' recovery of costs spent implementing statutorily required energy-efficiency and peak-demand-reduction programs was unlawful—Order reversed and cause remanded.*

(No. 2018-0379—Submitted February 20, 2019—Decided October 15, 2019.)

APPEAL from the Public Utilities Commission, No. 16-0743-EL-POR.

_____

**O'CONNOR, C.J.**

{¶ 1} Since 2009, Ohio electric-distribution utilities have been required to implement programs to increase energy efficiency and reduce energy demand to meet specific annual targets or benchmarks. R.C. 4928.66(A)(1)(a) and (b). Under the statutory scheme, each electric utility must file a portfolio plan every three years that shows how the utility will meet its energy-efficiency and peak-demand-reduction statutory benchmarks. *See* Ohio Adm.Code 4901:1-39-04. A portfolio plan uses a variety of programs in different markets that are designed to increase energy efficiency and reduce peak demands on the utility's system. For example, a residential program in a portfolio plan may include distribution of LED lightbulbs or discounted "smart" thermostats to customers.

{¶ 2} In this case, appellants Ohio Edison Company, the Cleveland Electric Illuminating Company, and the Toledo Edison Company (collectively, "FirstEnergy") submitted an application in April 2016 for approval of their portfolio plans for 2017 through 2019. Appellee, the Public Utilities Commission, ultimately approved the plans in November 2017, but with a modification to include a "cost cap"—an annual cap on FirstEnergy's recovery of costs incurred in implementing the energy-efficiency, peak-demand-reduction, and shared-savings programs[1] not to exceed 4 percent of its reported 2015 total revenues.

{¶ 3} FirstEnergy and appellants Environmental Law & Policy Center, Environmental Defense Fund, Natural Resources Defense Council, and Ohio Environmental Council (collectively, "environmental groups"), filed this appeal challenging the cost cap. Appellants have demonstrated reversible error, and therefore, we reverse and remand for further consideration.

---

1. Shared savings is an incentive payment from customers to the utility for the utility's introduction of cost-effective programs that exceed the statutory mandates for energy efficiency and peak-demand reduction.

**Facts and Procedural Background**

**{¶ 4}** R.C. 4928.66 requires electric-distribution utilities to implement programs that increase energy efficiency and reduce peak demand. R.C. 4928.66(A)(1)(a) and (b). A measure contributes to energy efficiency if it reduces the amount of energy required to perform a task. *See* Ohio Adm.Code 4901:1-39-01(L). "Peak demand" refers to the time at which the most energy is being consumed simultaneously across the utility's system.[2] Reducing peak demand lowers the price of power and tends to reduce the number of generation plants needed to meet demand. R.C. 4928.66 imposes annual benchmarks in both categories, and if the electric-distribution utility fails to meet the requirements, the law requires that the commission assess a forfeiture on the utility, R.C. 4928.66(C); *In re Application of Columbus S. Power Co.*, 129 Ohio St.3d 46, 2011-Ohio-2383, 950 N.E.2d 164, ¶ 3. The requisite benchmarks are calculated from a "baseline" formula in the statute based on the average total kilowatt hours sold and average peak demand on the utility in the preceding three years. R.C. 4928.66(A)(2)(a). A utility may apply to the commission to amend the benchmarks if they cannot be "reasonably achieve[d] * * * due to regulatory, economic, or technological reasons beyond [the utility's] reasonable control." R.C. 4928.66(A)(2)(b).

**{¶ 5}** On April 15, 2016, FirstEnergy filed an application seeking approval of three-year-program portfolio plans for each of the companies. The plans, among other things, described how the companies intended to meet their energy-efficiency and peak-demand-reduction benchmarks for 2017 through 2019. The application noted that the commission had already approved the cost-recovery mechanism for the plans as a rider in FirstEnergy's electric-security plan.

---

2. The commission's rules define "peak demand" as "the average maximum hourly electricity usage during the highest 100 hours on the electric utility's system in a calendar year." Ohio Adm.Code 4901:1-39-01(R).

**{¶ 6}** On December 9, 2016, FirstEnergy filed a stipulation to "set forth the understanding and agreement of the Signatory Parties and to recommend that the Commission approve and adopt" the plan as modified by the stipulation. Intervening appellee, the Office of Ohio Consumers' Counsel ("OCC"), and the commission's staff opposed the stipulation. Relevant here, the commission's staff proposed an annual cap of 3 percent of the companies' 2015 operating revenues on FirstEnergy's recovery of costs incurred in implementing the programs to meet the benchmarks. The commission's staff and OCC argued that the portfolio plans would not benefit ratepayers or the public interest without the cost cap.

**{¶ 7}** FirstEnergy and the environmental groups opposed the cap, arguing that the plans still benefitted ratepayers and the public interest without the 3 percent limitation on recovery of FirstEnergy's costs. Specifically, they noted that the plans included an annual budget targeted to achieve the benchmarks in a cost-effective manner. They also noted that customers were protected under a bill-mitigation provision that the commission had approved in FirstEnergy's fourth electric-security plan. Further, they argued that the plans were projected to generate benefits to customers that exceeded the costs of the programs. Finally, they argued that the cost-cap proposal did not have a basis in the applicable rules or statutory language.

**{¶ 8}** A hearing was held over five days, after which the commission issued an order approving the stipulation, but with modifications, including a cost-recovery cap. Although the commission rejected the staff's recommended 3 percent cap, it adopted a 4 percent cap. According to the commission, imposing a 3 percent cap on FirstEnergy would be unfair in light of the 4 percent caps recently imposed in the other Ohio electric-distribution-utilities' portfolio-plan cases. Pub. Util. Comm. No. 16-0743-EL-POR, ¶ 55 (Nov. 21, 2017). The commission also found that it was unclear from the record evidence whether the companies could meet their benchmarks with a 3 percent cost cap. *Id*. at ¶ 56.

{¶ 9} FirstEnergy and the environmental groups filed applications for rehearing, which the commission denied on January 10, 2018. This appeal followed.

## Standard of Review

{¶ 10} "R.C. 4903.13 provides that a [Public Utilities Commission] order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50, *modified on other grounds*, *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 300, 2006-Ohio-5789, 856 N.E.2d 213, ¶ 87. "A [Public Utilities Commission] order is unlawful if it is inconsistent with relevant statutes or with the state or federal constitutions." *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 384, 2006-Ohio-5853, 856 N.E.2d 940, ¶ 44.

## Analysis

{¶ 11} FirstEnergy argues under its first proposition of law that the commission lacked statutory authority to adopt and implement a cost cap under R.C. 4928.66. We resolve the appeal on this issue and conclude that the commission lacked statutory authority to impose a cap on FirstEnergy's recovery of program costs.

{¶ 12} In its opinion and order the commission stated:

[A]doption of a cost cap in this proceeding does not constitute a new legal standard or rule as defined under R.C. 111.15, but is a permissible exercise of this Commission's broad authority to administer and enforce the provisions of R.C. Title 49, and to regulate a utility's portfolio plan under R.C. 4928.66, since the General Assembly did not specifically prohibit a cost cap.

Pub. Util. Comm. No. 16-0743-EL-POR, at ¶ 56, citing *Kazmaier Supermarket, Inc. v. Toledo Edison Co.*, 61 Ohio St.3d 147, 150, 573 N.E.2d 655 (1991).

{¶ 13} On rehearing, the commission reiterated:

As noted in the Commission's decision, the 4% Cap is a reasonable measure to moderate the bill impacts of rising [energy efficiency/peak-demand reduction] rider charges on FirstEnergy customers under this Commission's broad authority to administer and enforce the provisions of R.C. Title 49, which has been recognized by the Court.

Pub. Util. Comm. No. 16-0743-EL-POR, Rehearing entry, ¶ 11 (Jan. 10, 2018), citing *Kazmaier* at 150.

{¶ 14} FirstEnergy asserts that R.C. 4928.66 contains no language that authorizes the commission to impose a cap on the recovery of costs incurred to meet the statutory benchmarks under the portfolio plans. FirstEnergy cites *Pike Natural Gas Co. v. Pub. Util. Comm.*, 68 Ohio St.2d 181, 183, 429 N.E.2d 444 (1981), quoting *Dayton Communications Corp. v. Pub. Util. Comm.*, 64 Ohio St.2d 302, 307, 414 N.E.2d 1051 (1980), for the proposition that the commission " 'is a creature of the General Assembly and may exercise no jurisdiction beyond that conferred by statute.' " *See also Canton Storage & Transfer Co., Inc. v. Pub. Util. Comm.*, 72 Ohio St.3d 1, 5, 647 N.E.2d 136 (1995). FirstEnergy notes that R.C. 4928.64, which sets forth renewable-energy-resource requirements, was enacted at the same time as R.C. 4928.66 and R.C. 4928.64 includes a cap on the maximum cost of compliance. *See* 2008 Am.Sub.S.B. No. 221; R.C. 4928.64(C)(2) and (3); Ohio Adm.Code 4901:1-40-07. According to FirstEnergy, the absence of a similar

provision in R.C. 4928.66 demonstrates the General Assembly's intent to prohibit the commission from limiting cost recovery under R.C. 4928.66.

{¶ 15} We agree with FirstEnergy that the commission acted unlawfully in imposing a cap on cost recovery under the portfolio plans.

{¶ 16} Neither the commission's order nor its rehearing entry cites any language in R.C. 4928.66 that would authorize the commission to impose a cost-recovery cap in this case. Instead, the commission states only that it can impose the cap because it has "broad authority to administer and enforce the provisions of R.C. Title 49, and to regulate a utility's portfolio plan under R.C. 4928.66." Pub. Util. Comm. No. 16-0743-EL-POR, at ¶ 56 But we find no express or implied authorization in the language of R.C. 4928.66 that would allow the commission to preemptively impose a limitation on FirstEnergy's recovery of costs incurred in order to meet its statutory benchmarks.

{¶ 17} "The [Public Utilities Commission], as a creature of statute, has no authority to act beyond its statutory powers." *Discount Cellular, Inc. v. Pub. Util. Comm.*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 51. Accordingly, we decline to assume that the General Assembly implicitly granted authority to the commission to impose the cost-recovery cap here under R.C. 4928.66 without any clear indication in the statutory language to that effect. *See Columbus S. Power Co. v. Pub. Util. Comm.*, 67 Ohio St.3d 535, 537-541, 620 N.E.2d 835 (1993); *Time Warner AxS v. Pub. Util. Comm.*, 75 Ohio St.3d 229, 238-241, 661 N.E.2d 1097 (1996).

{¶ 18} The General Assembly's inclusion of cost-cap language in R.C. 4928.64(C)(2) and (3) further undermines the commission's determination that it had authority to impose a cost cap under R.C. 4928.66. Under R.C. 4928.64(C)(3), an electric-distribution utility does not need to comply with the statutory benchmarks for renewable-energy-resource requirements if its "reasonably expected cost of that compliance exceeds its reasonably expected cost of otherwise

producing or acquiring the requisite electricity by three percent or more." This provision, enacted at the same time as R.C. 4928.66, demonstrates that the General Assembly recognized a maximum cost for a utility's compliance with the renewable-energy-resource requirements. In contrast, in R.C. 4928.66, the General Assembly included no such provision to cap the recovery of compliance costs. Thus, we presume it chose not to do so. *See, e.g.*, *Indep. Ins. Agents of Ohio, Inc. v. Fabe*, 63 Ohio St.3d 310, 314, 587 N.E.2d 814 (1992) ("It is apparent that the General Assembly knows how to use these words when it so chooses").

{¶ 19} The commission's own rules also reflect the lack of statutory authority to implement a cost-recovery cap for the energy-efficiency and peak-demand-reduction programs in R.C. 4928.66. For the renewable-energy-resource benchmarks in R.C. 4928.64, the commission enacted a corresponding regulation entitled "Cost cap," which describes the process by which a utility can apply for a commission determination that the cost of compliance would exceed its expected generation costs by 3 percent or more. Ohio Adm.Code 4901:1-40-07. There is no such regulatory provision for utilities engaging in energy-efficiency and peak-demand-reduction programs under R.C. 4928.66. In fact, the commission promulgated Ohio Adm.Code 4901:1-39-07, entitled "Recovery mechanism," which describes how a utility may submit "a request for recovery of an approved rate adjustment mechanism" to recover costs for energy-efficiency and peak-demand-reduction programs under R.C. 4928.66. But that rule includes no language regarding a cost-recovery cap or a cap on a utility's program spending.

{¶ 20} In sum, the commission's determination that the cost-recovery cap in this case is a permissible exercise of its broad authority is not supported by the statutory language. Thus, we conclude that the commission acted unlawfully here by modifying the stipulation to include the 4 percent cost cap.

**Conclusion**

{¶ 21} We hold that the commission lacked authority under R.C. 4928.66 to impose a cost-recovery cap in this case. Therefore, we reverse the commission's decision and remand the cause for approval of the portfolio plans without the cap on cost recovery.

Orders reversed<br>and cause remanded.

KENNEDY, FRENCH, FISCHER, and DEWINE, JJ., concur.

DONNELLY, J., dissents in part and concurs in judgment only, with an opinion joined by STEWART, J.

_____

**DONNELLY, J., dissenting in part and concurring in judgment only.**

{¶ 22} The annual "cost cap" in this case limits the amount of costs that Ohio Edison Company, the Cleveland Electric Illuminating Company, and the Toledo Edison Company (collectively, "FirstEnergy" or "the companies") can recover for implementing energy-efficiency, peak-demand-reduction, and shared-savings programs under R.C. 4928.66(A)(1)(a) and (b). The Public Utilities Commission approved the cost cap under its broad authority to administer and enforce the provisions of R.C. Title 49, as well as its authority to regulate a utility's portfolio plan under R.C. 4928.66. According to the majority, the commission erred because there is "no express or implied authorization in the language of R.C. 4928.66 that would allow the commission to preemptively impose a limitation on FirstEnergy's recovery of costs incurred in order to meet its statutory benchmarks." Majority opinion at ¶ 16. I believe that the commission *does have* statutory authority to impose a cap on FirstEnergy's cost recovery, but that here, the commission failed to provide adequate record support and reasoning for its decision. Thus, I concur in the judgment to reverse the commission's order, but for different reasons, and I dissent from the majority's order on remand.

**Imposing an annual cost cap in this case was lawful and reasonable**

{¶ 23} The commission's imposition of a cap on FirstEnergy's recovery of its costs is proper for two reasons. First, R.C. 4928.66 requires electric utilities to achieve certain levels of energy savings and peak-demand reduction but says virtually nothing about the utility's ability to recover costs from customers for complying with those mandates. The statute makes only general references to a cost-recovery mechanism. R.C. 4928.66(A)(2)(c) and (d)(i)(II).[3] When a statute does not prescribe a particular formula or methodology, the commission has broad discretion to decide how to achieve a legitimate objective, and our review of those decisions is deferential. *See Payphone Assn. v. Pub. Util. Comm.*, 109 Ohio St.3d 453, 2006-Ohio-2988, 849 N.E.2d 4, ¶ 25; *In re Application of Columbus S. Power Co.*, 129 Ohio St.3d 46, 2011-Ohio-2383, 950 N.E.2d 164, ¶ 27.

{¶ 24} In reaching its decision, the majority points to the absence of language in R.C. 4928.66 authorizing the commission to impose a cap on cost recovery. Majority opinion at ¶ 16. But that is not enough to demonstrate reversible error. While there is no language in R.C. 4928.66 that expressly authorizes the commission to impose a cap on cost recovery, the statute likewise imposes no restrictions on the commission's authority over cost recovery. And this court has read a lack of conditions on a statutory grant of power as a grant of discretion to the agency. *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 68; *Util. Serv. Partners, Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, ¶ 13.

{¶ 25} Second, the commission's decision to impose a cap on cost recovery in this case was reasonable and supported by the record. *See* R.C. 4903.09 (requiring the commission to support its decisions with evidence and a reasoned

---

3. R.C. 4928.66(D) also provides for a revenue-decoupling mechanism, which allows the utility to recover lost revenue as a result of implementing energy-efficiency or energy-conservation programs. But this provision is not relevant here.

explanation). The commission cited the commission staff's testimony in finding that "a cost cap on the potential [energy-efficiency/peak-demand-reduction] program costs and shared savings to be borne by ratepayers is [a] reasonable measure given the rising [energy-efficiency/peak-demand-reduction] rider amounts billed to customers." Pub. Util. Comm. No. 16-0743-EL-POR, ¶ 55 (Nov. 21, 2017). Staff witness Donlon testified that residential customers were paying between $1.98 and $2.90 each month through the rider. Donlon further testified that the commission staff believed that an annual cap on FirstEnergy's spending on energy-efficiency and peak-demand-reduction programs was necessary and would provide "some price assurances to customers" because the rider collecting those costs "has become one of the highest riders on residential customers' bills."

{¶ 26} In deciding whether to impose a cost cap, the commission also weighed the benefits of FirstEnergy's energy-efficiency and peak-demand-reduction programs against the programs' costs over the entire three-year portfolio plan. Specifically, the commission found that it was necessary to "weigh the potential ultimate program benefits against the bill impacts to customers in the 2017-2019 Portfolio Plan period." Pub. Util. Comm. No. 16-0743-EL-POR, at ¶ 55. On rehearing, the commission reiterated that it must balance the current costs of the companies' riders against the potential future cost savings to customers from the energy-efficiency and peak-demand-reduction programs. Pub. Util. Comm. No. 16-0743-EL-POR, Rehearing entry, ¶ 9 (Jan. 10, 2018). That is, the commission placed more weight on the short-term costs that customers would pay for energy-efficiency and peak-demand-reduction programs than the potential long-term energy savings for customers from those programs.

{¶ 27} We have consistently held that the commission possesses "broad discretion" over designing rates and other rate-related matters. *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 125 Ohio St.3d 57, 2010-Ohio-134, 926 N.E.2d 261, ¶ 20; *see also Citywide Coalition for Util. Reform v. Pub. Util. Comm.*, 67 Ohio

St.3d 531, 534, 620 N.E.2d 832 (1993). Contrary to the holding of the majority opinion, the commission did not abuse its discretion when it imposed the annual cap on cost recovery.

**R.C. 4928.64(C)(3) protects utilities and does not evince the General Assembly's intent to prohibit the use of a cap on cost recovery to protect customers under R.C. 4928.66**

{¶ 28} The majority further maintains that the existence of a cost cap in R.C. 4928.64(C)(3) "undermines the commission's determination that it had authority to impose a cost cap under R.C. 4928.66." Majority opinion at ¶ 18. R.C. 4928.64 contains renewable-energy-resource requirements for Ohio electric utilities. Under R.C. 4928.64(C)(3), an electric-distribution utility does not need to comply with the statutory benchmarks "to the extent that its reasonably expected cost of compliance exceeds its reasonably expected cost of otherwise producing or acquiring the requisite electricity by three per cent or more." The majority finds that because R.C. 4928.64(C)(3) was enacted at the same time as R.C. 4928.66, the fact that it provides a cost cap demonstrates the General Assembly's intent not to include a cost cap in R.C. 4928.66. But the majority overlooks that the cost cap under R.C. 4928.64 differs in purpose and operation from the cap on cost recovery imposed under R.C. 4928.66 in this case.

{¶ 29} The cost cap authorized by R.C. 4928.64(C)(3) is designed principally to protect electric-distribution utilities. Under this provision, the utility can avoid costly renewable-energy mandates—and protect itself against any compliance penalties—if the cost of complying with the mandate is at least 3 percent higher than the utility's cost to generate the power itself or purchase it from other energy sources. Moreover, the cost cap under R.C. 4928.64(C)(3) is not mandatory, but can be invoked at the utility's discretion, as set forth in the statute and under the corresponding administrative rule. *See* Ohio Adm.Code 4901:1-40-07(B) ("An electric utility * * * may file an application requesting a determination

from the commission that its reasonably expected cost of compliance with a renewable energy resource benchmark * * * would exceed its reasonably expected cost of generation to customers by three per cent or more").

{¶ 30} Conversely, the cost cap adopted by the commission under R.C. 4928.66 is designed primarily to protect *customers* by limiting how much the utility can charge them each year for the utility's implementation of energy-efficiency and peak-demand-reduction programs. Because the two cost caps operate differently and serve distinct purposes, the express provision of a cost cap in R.C. 4928.64(C)(3) does not, as the majority contends, demonstrate by negative implication the General Assembly's intent to prohibit the commission from adopting a cap on cost recovery under R.C. 4928.66 in order to protect customers against costly program charges.

### Reversal is appropriate on separate, narrow grounds

{¶ 31} Although I believe the commission has statutory authority to impose a cap on cost recovery under R.C. 4928.66 as a general matter, it failed to justify its decision to adopt a 4 percent cap in this specific case. The commission's arrival at a figure of 4 percent lacked evidence and a reasoned explanation, in violation of R.C. 4903.09. Accordingly, I would reverse the commission's order and remand the case to correct this error only.

{¶ 32} During the proceedings below, the commission staff proposed a 3 percent cap on FirstEnergy's program costs and shared savings. The 3 percent cap was calculated based on the companies' 2015 total annual operating revenues as reported to the Federal Energy Regulatory Commission ("FERC").

{¶ 33} According to the commission staff, this baseline was chosen for two reasons. One, a 3 percent cap on FirstEnergy's recovery of program costs and shared savings would provide price security for all customers. Two, staff projected that FirstEnergy would still be able to meet its energy-efficiency and peak-demand-reduction benchmarks under a 3 percent cap. On the latter point, staff relied

specifically on data from the companies' 2012-2014 annual status reports, which showed that on average they had underspent their budgets by 21 percent and overachieved their benchmarks by 50 percent during that period.

**{¶ 34}** The commission approved a cost cap based on the commission staff's proposal, but rejected the 3 percent cap in favor of a 4 percent cap. This is the commission's discussion of why it adopted a 4 percent cap:

> We agree that a 3% Cap would be unfair to impose on FirstEnergy in light of the caps recently approved in the other Ohio [electric-distribution-utility] Portfolio Plan decisions cited above. As noted in our recent decisions involving the other Ohio [electric-distribution-utility] Portfolio Plan cases referenced above, we find that a cost cap on the potential [energy-efficiency/peak-demand-reduction] program costs and shared savings to be borne by ratepayers is [a] reasonable measure given the rising [energy-efficiency/peak-demand-reduction] rider amounts billed to customers, as reported by [staff witness] Mr. Donlon. (Staff Ex. 1, at 5-7, Tr. II at 328, Tr. III at 446-447). * * *
>
> * * * While the evidence of record is unclear whether the Companies will be able to meet their statutory mandates within Staff's proposed cost cap, we will raise the cap on recovery of [energy-efficiency/peak-demand-reduction] programs and shared savings to four percent of the Companies' 2015 FERC reported revenues to align FirstEnergy's cost caps with those of the other Ohio utilities. * * * Moreover, the Companies may request that the Commission amend their benchmarks pursuant to R.C. 4928.66(A)(2)(b).

Pub. Util. Comm. No. 16-0743-EL-POR, at ¶ 55-56.

{¶ 35} The commission added little to this analysis on rehearing. In response to FirstEnergy's argument that the 4 percent cap was unsupported by evidence, was inherently unfair, and resulted in significant inequities among Ohio's electric-distribution utilities, the commission stated:

> These argument[s] were raised and fully considered in the Opinion and Order at ¶¶ 52-57. As discussed above, the 4% Cap was adopted as a reasonable measure to limit the rate impact on FirstEnergy customers in response to credible Staff testimony regarding the Companies' increasing [energy-efficiency/peak-demand-reduction] riders. While the impact of the 4% Cap may affect each of the Ohio [electric-distribution utilities] somewhat differently, the application of a four percent cap based on each [utility's] reported total sales to ultimate customers should mitigate any unfairness to FirstEnergy shareholders.

Pub. Util. Comm. No. 16-0743-EL-POR, Rehearing entry, at ¶ 19.

{¶ 36} R.C. 4903.09 requires the commission to explain its decisions and identify in sufficient detail the record evidence upon which its orders are based. *MCI Telecommunications Corp. v. Pub. Util. Comm.*, 32 Ohio St.3d 306, 311-312, 513 N.E.2d 337 (1987). The commission abuses its discretion if it decides an issue without adequate record support. *Indus. Energy Users-Ohio v. Pub. Util. Comm.*, 117 Ohio St.3d 486, 2008-Ohio-990, 885 N.E.2d 195, ¶ 30. In my view, the commission violated R.C. 4903.09 in two respects.

{¶ 37} First, the commission's order cites no evidence that would support the adoption of a 4 percent cap. Instead, the commission capped FirstEnergy's recovery of program costs at 4 percent based solely on the fact that it had imposed

a 4 percent cap on the other Ohio utilities. Although the commission cited the testimony of staff witness Donlon, it did so only for the purpose of showing that a cap was necessary "given the rising [energy-efficiency/peak-demand-reduction] rider amounts billed to customers." Pub. Util. Comm. No. 16-0743-EL-POR, at ¶ 55.

{¶ 38} Donlon, however, testified in favor of a 3 percent cost cap, which the commission rejected, in part because "the evidence of record [was] unclear whether the companies [would] be able to meet their statutory mandates" under a 3 percent cap on recovery. *Id*. at ¶ 56. But the commission inexplicably made no finding that the companies would be able to meet their energy-efficiency and peak-demand-reduction mandates under a 4 percent cap. Instead, the commission cited R.C. 4928.66(A)(2)(b), which allows it to amend benchmarks if a utility "cannot reasonably achieve [them] due to regulatory, economic, or technological reasons beyond its reasonable control." Although invoking this provision may allow the companies to avoid penalties if they cannot meet their statutory mandates under the 4 percent cost cap, it does not relieve the commission of its obligation under R.C. 4903.09 to file "written opinions setting forth the reasons prompting the decisions arrived at, based upon [its] findings of fact," which must be included with the record of the proceedings. In short, evidence was needed; none was provided.

{¶ 39} Second, the commission raised the commission staff's 3 percent cap to 4 percent without specifically addressing any of FirstEnergy's challenges to the methodology the staff used to calculate the amount of the cap. Among other challenges, FirstEnergy claimed that the commission staff (1) relied on obsolete historical data and assumptions, i.e., the 2012-2014 annual status reports, (2) ignored FirstEnergy's actual pricing data, and (3) failed to consider the impact of "switch rates" among all Ohio utilities when using the operating revenues to calculate the cap on cost recovery. The commission adopted a 4 percent cap in this case solely "to align FirstEnergy's cost caps with those of the other Ohio utilities."

Pub. Util. Comm. No. 16-0743-EL-POR, at ¶ 56. On rehearing, the commission stated that "a four percent cap based on each [company's] reported sales to ultimate customers *should* mitigate any unfairness to FirstEnergy's shareholders." (Emphasis added.) Pub. Util. Comm. No. 16-0743-EL-POR, Rehearing entry, at ¶ 19.

{¶ 40} R.C. 4903.09 prohibits summary rulings and conclusions that do not develop the supporting rationale or record. *MCI Telecommunications Corp.*, 32 Ohio St.3d at 312, 513 N.E.2d 337. If the order included *any* reasonable analysis of why the commission selected the staff's methodology over FirstEnergy's, FirstEnergy's arguments would be easily dispatched. However, there is no explanation. And it is not self-evident how raising the cap on recovery by 1 percent will mitigate any unfairness to FirstEnergy, and even the commission—by using the word "should"—seems less than certain of that outcome. As noted, FirstEnergy specifically challenged the methodology used to calculate the cap on the ground that it was unfair to the companies, but the commission never addressed those arguments.

{¶ 41} R.C. 4903.09 is mandatory, and while "strict compliance * * * is not required," failure by the commission to provide record support for an opinion constitutes an abuse of discretion. *Indus. Energy Users-Ohio.*, 117 Ohio St.3d 486, 2008-Ohio-990, 885 N.E.2d 195, ¶ 30. In the end, it is impossible to make any determination about the reasonableness of the commission's decision to adopt a 4 percent cap on cost recovery without evidence and explanation in its opinion and order. *See Ohio Consumers' Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 300, 2006-Ohio-5789, 856 N.E.2d 213, ¶ 31; *In re Comm. Rev. of Capacity Charges of Ohio Power Co.*, 147 Ohio St.3d 59, 2016-Ohio-1607, 60 N.E.3d 1221, ¶ 56-57.

{¶ 42} The error is clear and prejudicial. If the cost cap is understated, it results in less money for FirstEnergy to spend on programs to comply with statutory

benchmarks. For these reasons, this part of the commission's order should be remanded for further proceedings.

### Conclusion

{¶ 43} For the reasons stated, I would reverse the commission's order based on its failure to adequately explain its decision to impose a 4 percent annual cap on cost recovery in this case, and I would remand for further proceedings limited to the commission's decision to adopt a 4 percent cost cap.

STEWART, J., concurs in the foregoing opinion.

_____

Jones Day, Michael R. Gladman, and Sergio A. Tostado; and FirstEnergy Service Company and Joshua R. Eckert, for appellants Ohio Edison Company, Cleveland Electric Illuminating Company, and Toledo Edison Company.

Miranda R. Leppla, for appellants Environmental Law & Policy Center, Ohio Environmental Council, and Environmental Defense Fund.

Robert Dove, for appellant Natural Resources Defense Council.

Dave Yost, Attorney General, and William L. Wright, John H. Jones, and Jodi J. Bair, Assistant Attorneys General, for appellee.

Bruce Weston, Ohio Consumers' Counsel, and Christopher Healey, Assistant Consumers' Counsel, for intervening appellee.

Colleen L. Mooney, urging reversal for amicus curiae, Ohio Partners for Affordable Energy.

_____